# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,       )
                                           )
                    Plaintiff,   )  Case No. 2:16-cr-0062-LRH-GWF
                                         )
vs.                                       )  **FINDINGS &**
                                       )  **RECOMMENDATIONS**
                                       )  **Re:  Motion to Suppress (ECF No. 63)**
ALISHA PEREZ,                )
                                         )
                    Defendant.  )

This matter is before the Court on Defendant Alisha Perez's Motion to Suppress Statement (ECF No. 63), filed on September 26, 2016.  The Government filed its Response (ECF No. 87) on December 5, 2016, and Defendant filed her Reply (ECF No. 91) on December 9, 2016.  The Court conducted a hearing in this matter on January 6, 2016.

## BACKGROUND

Defendant Alisha Perez is charged in a superceding indictment filed on June 22, 2016 with conspiracy to distribute a controlled substance in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(A)(ii), and 846; possession of firearms in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); possession of a stolen firearm in violation of 18 U.S.C. § 922(j), and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h).

Ms. Perez was interviewed by Detectives B. Embrey and R. Wilson of the Las Vegas Metropolitan Police Department on February 10, 2016.  *Motion to Suppress (ECF No. 63), Exhibit A, Transcript of "Voluntary Statement;"  Notice of Manual Filing (of Audio Recording of Interview)*

*(ECF No. 90).*[1]  The detectives were investigating the murder of Mario Jimenez in which

Defendant's boyfriend, co-defendant Hakim Rydell Branche-Jones, was allegedly involved.  The

interview took place at the Clark County Detention Center where Defendant was in custody.  The

interview began at 1:51 P.M. and concluded at 3:07 P.M.  The interview began with Detective

Embrey asking:

> Q.     Alisha, do you understand we're recording our conversation?
>
> A.     Yeah.
>
> Q.     Okay.  Now, I understand that, um, you were I guess in essence served with some paperwork . . .
>
> A.     Yeah.
>
> Q.     . . . earlier this morning . . .
>
> A.     Yeah.
>
> Q.     . . . by another detective?
>
> A.     Mm-hm.
>
> Q.     Okay.  And then you had told that detective you wanted to speak to us?
>
> A.     Yes.
>
> Q.     Um, was that on your own free will? Was there any promises or any threats like that?
>
> A.     No.
>
> Q.     Okay. Um, I know you requested an attorney last night.
>
> A.     Yeah.
>
> Q.     Okay.  You are in custody.
>
> A.     Mm-hm.
>
> Q.     Okay?  And because of that, I still have to advise you of your rights.
>
> A.     Mm-hm.
>
> Q.     Does that make sense?
>
> A.     Yeah.

---

[1] The undersigned has read the transcript and listened to the audio recording of the interview.

1   Q.   Okay.  You have the right to remain silent.  Anything you say can be
         used against you in a court of law.  You have the right to the presence
2        of an attorney during questioning.  If you cannot afford an attorney,
         one will be appointed before questioning.  Do you understand these
3        rights?

4   A.   Yeah.

5   Q.   Okay.

6   A.   So can I have one?

7   Q.   If you would like one yes.  But I was understanding that you wanted . . .

8   A.   Do you think that's going to . . .

9   Q.   . . . to talk to us . . .

10  A.   . . . help, though or no?

11  Q.   I don't know what you want to talk to us about.  Now I'll be frank with you.
         Okay?  Um, my main concern is not the narcotics.
12
13  A.   Mm-hm.

    Q.   My main concern is a murder investigation that we are conducting.
14
    A.   Mm-hm.
15
    Q.   Okay?  That murder involves Mario Jimenez.  He is the decedent.  He's the
16       one who is-who is dead.

17  A.   Mm-hm.

18  Q.   Okay?  That's why I'm here to talk to you – to see what you know about that
         and that type of thing.
19
20  A.   Mm-hm.

    Q.   So, that's, uh, like I told you from the get-go: I'm very upfront and very
21       straightforward.

22  A.   Right.

23  Q.   Okay.

24  A.   So if I do tell you what you need to know, like what is that going to do for
         me?
25
26  Q.   I can't make promises.  Okay?  But what I can tell you is I will, um, and it all
         depends on what- I don't know what you have to tell me.  Okay?

27  A.   Mm-hm.

28  Q.   Um, I will get a hold of the District Attorney that's in charge of this

                                          3

1   investigation.  And I will tell him, you know, in essence what you told us.
2   And, um, based on what you have to say, you know, it could, you know, used
    in consideration . . .

3   *Exhibit A, pgs. 4935–38.*

4       Detective Wilson told the Defendant that her cooperation could result in a reduced charge,

5   "but like Detective Embrey said, we don't know what you're going to tell us.  So we can't say 'Oh,

6   well we'll do this for you' type of thing, when we can't."  *Id.* at pgs. 4938–39.  Detective Wilson

7   also stated: "If you have - - relevant information about the murder investigation, I really do think it's

8   in your best interest to talk, um, tell us what you know . . . ."  *Id.* at pg. 4940.  In response to

9   Defendant's question whether the detectives would be able to help her boyfriend, Detective Embrey

10  stated: "I don't know.  I don't know what you have to say.  Hakim is in a world of trouble . . . ."  *Id.*

11  The detectives stated that they had met with Hakim the previous evening and had done their "best to

12  get him an attorney because we felt it was in his best interests to have an attorney and hear his side of

13  it."  *Id.* at pg. 4941.  They stated that they had not heard back from Hakim whether he wished to

14  speak with them.  *Id.*  The detectives told Defendant that her wanting to help Hakim "cover stuff up"

15  was not going to help her or Hakim, and would not help her child.  *Id.* at pg. 4942.

16      The detectives stated that they could not promise Defendant that what she told them would

17  not come out in court.  *Id.* at pgs. 4942–43.  Ms. Perez indicated that she was more afraid of what

18  other individuals might do once they found out she had made a statement or testified.  Detective

19  Embrey responded:  "Well, and once again, I can't make promises."  *Id.* at pg. 4943.  Detective

20  Wilson told Defendant that nobody could make her testify, but that "usually when someone

21  cooperates with the State and provides information, any assistance that the State gives is contingent

22  upon the person's willingness to testify."  *Id.* at pg. 4944.

23      The detectives engaged in further discussion with Defendant about her number one priority–

24  her son.  *Id.* at pgs. 4946–47.  After some back and forth, the interview continued as follows:

25      Q.      You need to worry about yourself at this point.  Okay?

26      Q1.     And your son.

27      Q.      And your son.

28      Q.1     That's the mo- that's the most important thing.

4

1
2
3
4
5

Q.      And we don't mean to keep on bringing up your son to make you cry and - and that's - I have a, you know - a boy.  He has a couple of boys.  We understand.  You know?  That's not our intention here.  But, um, we have seen it several times where the girlfriend, the spouse, focuses on the other person's needs versus what she needs and what her child needs.  And we - we've seen that way too many times.  We can always start.  And if you want to stop, you stop.  I mean that plain and simple.  And this won't go anywhere until, you know, we're ready.  Okay?  Do you want to take a couple of seconds and kind of gather yourself?

6       Q1.     Ready to just do it?

7       Q.      Its just kind of a leap of faith.  I know.  I understand . . .

8       Q1.     Okay.

9       Q.      . . .that.  If you understand your rights, I just need your signature there.[2]  Okay?  Okay.  Let's just start with the – the basics.  How long have you and Hakim been together.

10

11      *Id.* at pgs. 4952–53.

12          The detectives then proceeded to ask Ms. Perez questions about her knowledge of the murder

13      as well as the related drug trafficking activities that led to the charges against her in the superceding

14      indictment.

15                                          **DISCUSSION**

16          **1.      Whether Defendant Invoked Her Right to Counsel, Thereby
                     Requiring the Detectives to Cease Further Questioning.**

17

18          Defendant Perez argues that she clearly invoked her right to counsel when she responded to

19      Detective Embrey's recitation of the *Miranda* warnings by asking, "So can I have one?"  Defendant

20      argues that the detectives were required to cease any further questioning at that point.  Instead, they

21      "proceeded to badger Ms. Perez by referring to a murder investigation, to her son, and to potential

22      "deals" that Ms. Perez might get."  *Motion (ECF No. 63), pgs. 2–3.*  The Government argues that

23      Defendant did not clearly invoke her right to counsel and the detectives were therefore not required

24      to stop questioning her.

25          In *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883 (1981), the Court, quoting

26

27

28          [2] Defendant acknowledges that she executed the written advice of rights form at this point in the interview.

                                          5

*Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630 (1966), stated that if after being advised of his rights, "the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.'" The Court stated that waiver of the right to counsel must not only be voluntary, it must also constitute a knowing and intelligent relinquishment of a known right or privilege, "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 482, 101 S.Ct. at 1884. The Court imposed additional safeguards when the accused asks for counsel. If the accused has expressed the desire to deal with the police only through counsel, then "he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 584–85, 101 S.Ct. at 1885.

In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350 (1994), the Court announced the rule for determining when a suspect has invoked his *Miranda* right to counsel. The majority opinion of five justices stated:

> Invocation of the *Miranda* right to counsel "requires, at minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. at 178, 111 S.Ct. at 2209. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. *See ibid.* ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*"); 101 S.Ct. at 1885 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added).

> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officer stop questioning the suspect. See *Moran v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) ("[T]he

> . . .

6

1  interrogation must cease until an attorney is present *only* [i]f the
2  individual states that he wants an attorney") (citations and internal
   quotation marks omitted).

3  *Id.* at 459, 114 S.Ct. at 2355.

4       The Court acknowledged that some suspects might not clearly articulate their right to

5  counsel, although they actually want to have a lawyer present.  It stated, however, that the primary

6  protection afforded to custodial suspects is the *Miranda* warnings themselves.  "[F]ull

7  comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever

8  coercion is inherent in the interrogation process."  *Id.* at 460, 114 S.Ct. at 2356.  The Court further

9  noted that when a suspect makes an ambiguous or equivocal statement, it may be good police

10 practice for the interviewing officers to clarify whether or not the suspect actually wants an attorney.

11 The officers, however, are not required to ask clarifying questions.  "If the suspect's statement is not

12 an unambiguous or unequivocal request for counsel, the officers have no obligation to stop

13 questioning him."  *Id.* at 461–62, 114 S.Ct. at 2356.  The four concurring justices departed from the

14 majority opinion precisely on this point.  They stated that "when law enforcement officials

15 'reasonably do not know whether or not the suspect wants a lawyer,' . . they should stop their

16 interrogation and ask him to make his choice clear."  *Id.* at 467, 114 S.Ct. at 2359.

17      Ms. Perez's question, "So can I have one?" (immediately after Detective Embrey advised her

18 of her *Miranda* rights) was not a clear invocation of her right to counsel.  Detective Embrey

19 responded to this question by stating "If you would like one yes.  But I was understanding that you

20 wanted . . . to talk to us." This answer was given at the same time Ms. Perez asked "Do you think

21 that's going to help, though or no?"  Ms. Perez could have stated that she wanted to speak to an

22 attorney before she proceeded with the interview, but she did not.  Detective Embrey could have

23 asked Ms. Perez if she was invoking her right to counsel, but he was not required to do so.

24 Defendant Perez did not clearly invoke her right to counsel.  The detectives therefore did not violate

25 *Miranda* or *Edwards* by continuing to ask questions.

26      **2.     Whether Defendant's Waiver of Her Right to Remain Silent and to
27             Counsel Was Voluntarily, Knowingly and Intelligently Made.**

28      Defendant argues that the detectives exerted undue influence or coercion to overcome her

7

1   free will and induce her to confess or make incriminating statements.  In order to be valid, a waiver

2   of the right to remain silent or to counsel must be voluntary, and must also constitute a knowing and

3   intelligent relinquishment of a known right.  The determination of waiver depends upon the totality

4   of the circumstances including the background, experience and conduct of the defendant.  *Edwards,*

5   *supra*, 451 U.S. at 482, 101 S.Ct. at 1884.  The Government has the burden of showing a valid

6   waiver and there is a presumption against waiver.  *United States v. Binder*, 769 F.2d 595, 599 (9th

7   Cir. 1985).  A suspect's reduced mental capacity can be a factor in determining whether the suspect's

8   free will was overborne by coercive or improper interrogation tactics.  *United States v. Preston*, 751

9   F.3d 1008, 1020 (9th Cir. 2014).  There is no indication that Ms. Perez has a reduced mental

10  capacity.  The transcript and recording of the interview indicate that she has, at least, the average

11  mental capacity of an educated adult; that she understood what was said to her; and that she also

12  appreciated the circumstances she was in, i.e., facing serious drug trafficking charges.  Prior to the

13  interview, Ms. Perez told another detective that she wanted to speak to the police.  *Exhibit A, pg.*

14  *4936.*  This fact weighs in favor of finding that her subsequent waiver of *Miranda* rights was

15  voluntary.  The audio recording shows that in giving the *Miranda* warnings, Detective Embrey spoke

16  in a reasonably clear manner, such that Defendant understand the warnings.

17          False promises made by officers that induce a suspect to confess can render it involuntary.

18  *Preston*, 751 F.3d at 1026.  Defendant Perez initiated the discussion of what the officers would do

19  for her if she provided them with information.  To wit:  "So if I do tell you what you need to know,

20  like what is that going to do for me?"  *Exhibit A, pg. 4938.*  The detectives repeatedly told Defendant

21  that they could not make any specific promises to her.  They stated that if what she told them was

22  truthful and usable, they would contact the district attorney, who would decide whether and what

23  type of benefit might be offered to Defendant.  *Id.* at pgs. 4938–40.  The detective told Defendant

24  that if she provided relevant, useful information, he would "go to bat" for her with the district

25  attorney.  *Id.* at pg. 4940.  The detectives, however, did not minimize the charges that Ms. Perez or

26  Hakim were facing.  They told Ms. Perez that she was facing serious drug trafficking charges and

27  that Hakim was being charged with murder and kidnapping.  *Id.* at pgs. 4950–51.

28  . . .

8

1    The detectives played to some extent on Defendant's emotions and her concern for her son in

2  encouraging her to provide information.  *Id.* at pgs. 4952–53.  Although Defendant became

3  emotional at that point and later when discussing her knowledge about the murder, her periods of

4  emotion or crying appear to have been brief.  During the course of the interview, she spoke in a calm

5  manner.  Despite the subject matter, Ms. Perez occasionally laughed and kidded with the detectives.

6  The interview proceeded in a generally straightforward and cooperative question and answer mode.

7  The detectives did not confront Defendant with contradictory or incriminating information.  Nor did

8  they accuse her of being untruthful or of withholding information, or make any threats.  In sum, the

9  interview was consensual, notwithstanding that Defendant was in custody and the interview occurred

10 in the county jail.

11                                    **CONCLUSION**

12    Prior to questioning, Defendant was informed of her *Miranda* rights.  Defendant did not

13 clearly and unequivocally invoke her right to counsel.  Based on a totality of the circumstances,

14 Defendant voluntarily, knowingly and intelligently waived her right to remain silent and to have

15 counsel.  Her subsequent statements to the detectives were not made under duress, coercion or undue

16 influence.  Accordingly,

17                                  **RECOMMENDATION**

18    **IT IS RECOMMENDED** that Defendant's Motion to Suppress Statement (ECF No. 63) be

19 **denied**.

20                                      **NOTICE**

21    Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

22 writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held

23 that the courts of appeal may determine that an appeal has been waived due to the failure to file

24 objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also

25 held that (1) failure to file objections within the specified time and (2) failure to properly address and

26 brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

27 . . .

28 . . .

9

factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 11th day of January, 2017.

GEORGE FOLEY, JR
United States Magistrate Judge